UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
                                :
DIANN LYNN CARUSO            :         3:18 CV 1913 (RMS)
                                  :
V.                               :
                                  :
ANDREW M. SAUL, COMMISSIONER :
OF SOCIAL SECURITY[1]       :         DATE: NOVEMBER 8, 2019
                                  :
------------------------------------------------------ x

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON THE DEFENDANT'S MOTION TO AFFIRM THE DECISION
OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ["SSA" or "the Commissioner"]

denying the plaintiff disability insurance benefits ["DIB"].

I.     ADMINISTRATIVE PROCEEDINGS

The plaintiff filed her application for DIB on February 4, 2015, claiming that she has been

disabled since January 26, 2015, due to major depressive disorder, anxiety, asthma, sleep apnea

and chronic neck, back and shoulder pain. (Certified Transcript of Administrative Proceedings,

dated January 11, 2019 ["Tr."] 89-99, 195-198).[2] The plaintiff's application was denied initially

(Tr. 89-99), and upon reconsideration. (Tr. 101-115). On March 28, 2016, the plaintiff requested

a hearing before an Administrative Law Judge ["ALJ"] (Tr. 131-132), and on October 3, 2017, a

---

[1] The plaintiff commenced this action against Nancy A. Berryhill, as Acting Commissioner of Social Security. (Doc. No. 1). On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security. Because Nancy A. Berryhill was sued in this action only in her official capacity, Andrew M. Saul is automatically substituted for Nancy A. Berryhill as the named defendant. See FED. R. CIV. 25(d). The Clerk of the Court shall amend the caption in this case as indicated above.

[2] The plaintiff filed an application for DIB on July 21, 2010 that was denied on October 5, 2010; she did not appeal. (Tr. 90). After the plaintiff's second application was denied on October 10, 2014, she also did not appeal. (Id.).

hearing was held in Hartford, Connecticut before ALJ Alexander P. Borré, at which the plaintiff and a vocational expert testified. (Tr. 45-74). The ALJ subsequently issued an unfavorable decision on December 6, 2017, denying the plaintiff's claims for benefits. (Tr. 25-44). The plaintiff appealed to the Appeals Council, which, on November 19, 2018, denied the plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-5).

On November 26, 2018, the plaintiff filed her complaint in this pending action (Doc. No. 1).[3] The parties consented to the jurisdiction of a United States Magistrate Judge on November 28, 2018, and this case was transferred to the undersigned. (Doc. No. 9). On February 11, 2019, the defendant filed his answer and administrative transcript, dated January 11, 2019. (Doc. No. 11). On April 5, 2019, the plaintiff filed her Motion to Reverse the Decision of the Commissioner (Doc. No. 13), with a Statement of Facts (Doc. No. 13-1), and brief in support (Doc. No. 13-2 ["Pl.'s Mem."]).[4] On July 15, 2019, the defendant filed his Motion to Affirm (Doc. No. 17), with a Statement of Material Facts (Doc. No. 17-2), and brief in support. (Doc. No. 17-1).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 13) is GRANTED, and the defendant's Motion to Affirm the Decision of the Commission (Doc. No. 17) is DENIED.

## II. FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is discussed in the plaintiff's Statement of Facts (Doc. No. 13-1) and the defendant's Statement of Material Facts. (Doc. No. 17-2). Though the Court has reviewed the entirety of the medical record, it cites only the portions of the record that are necessary to explain this decision.

---

[3] On the same day, the plaintiff filed a Motion for Leave to Proceed *in Forma Pauperis* (*see* Doc. No. 2), which the Court granted. (Doc. No. 8).
[4] The plaintiff also attached several cases to her Motion. (Doc. Nos. 13-3—13-11).

At the plaintiff's October 3, 2017 hearing, the plaintiff was fifty-eight years old (Tr. 49), and during the relevant period at issue, she lived with her adult son and a roommate in a house in Meriden, Connecticut. (Tr. 49-51). She graduated high school but did not complete any additional education or vocational training. (Tr. 52).

From 1977 to 2009, the plaintiff worked for Blue Cross Blue Shield in enrollment and billing. (Tr. 52-53). In 2011, she was employed as the office manager for Comprehensive Orthopedics. (Tr. 53-54). In 2014, she worked at the Middletown DSS office (a job she obtained through the staffing agency Hallmark Total Tech) in a "filing position." (Tr. 54). The plaintiff testified that she had problems completing her tasks at the Middletown DSS office because it involved "so much up and down and pulling out files" and hurt her back and neck. (Tr. 55). She would "go in [her] car [and] turn on [her] heated seat to be a heating pad." (*Id.*). She had to carry a 10-pound file box for that position. (*Id.*). She testified that, although she did not leave that job because of her back and neck problems, she could not have kept doing it. (Tr. 56).

The plaintiff also testified that she was able to drive but did not "drive far." (Tr. 51). She explained that she could drive for approximately 45 minutes before her lower back began to hurt. (Tr. 52). She tried to walk "every day just a little." She explained that she was able to walk the length of eight houses and back, and that it took her less than ten minutes to do so, but she needed to rest afterwards. (Tr. 59-60). She noted that she needed to "to walk on level ground." (Tr. 59). The plaintiff estimated that she could lift twelve pounds, an estimate based on the fact that she was able to pick up her lighter grandchildren. (Tr. 60). Additionally, the plaintiff's ability to concentrate and focus "changed drastically." (Tr. 61). She had "lists for everything" to "try to keep on top of things." (*Id.*). She did not like going out in crowds, and she would order groceries online because it was "hard for [her] to grocery shop." (Tr. 62). She testified that she completed one chore

a day and "focus[ed] on setting [her] alarm [for] 9:00." (Tr. 63). She did, however, "try to go out to dinner once a month" and sometimes watched her grandkids. (Tr. 64). She had panic attacks once every four months and issues with her sons triggered her anxiety. (Tr. 67).

A vocational expert testified that the plaintiff's past work as an office manager and enrollment clerk were both semi-skilled jobs performed at the sedentary level. (Tr. 70). The plaintiff's past work as a file clerk was a semi-skilled job performed at the light exertional level. (*Id.*). All three of the plaintiff's past jobs could be performed by a person limited to the light exertional level who could frequently climb ladders, ropes, and scaffolds, stoop, kneel, crouch, and crawl, and who was further limited to only occasional exposure to temperature extremes and extreme humidity and no concentrated exposure to fumes, dust, or gases. (*Id.*). If such a person was further limited to simple and repetitive tasks, those additional limitations would "eliminate" the plaintiff's past three jobs. (Tr. 71). Similarly, according to the vocational expert, if such a person were "off-task 15 percent of the workday due to symptoms of either back pain or anxiety-type symptoms [that] would cause that individual to leave the work area," such a person would not be employable at "any exertional level." (*Id.*).

## III.   THE ALJ'S DECISION

Following the five-step evaluation process,[5] the ALJ found that the plaintiff met the insured status requirements through December 31, 2018, (Tr. 30), and that the plaintiff had not engaged in

---

[5] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 404.1520(a). First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the

substantial gainful activity since January 26, 2015, her alleged onset date. (Tr. 31, citing 20 C.F.R. § 404.1571 *et seq.*).

At step two, the ALJ concluded that the plaintiff had the severe impairments of cervical spine and lumbar spine degenerative disc disease and asthma, (Tr. 31, citing 20 C.F.R. § 404.1520(c)), but that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 32-33, citing 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). Specifically, the ALJ concluded that the plaintiff's spinal conditions did not meet Listing 1.04 (Disorders of the Spine), and that the plaintiff's asthma did not meet Listing 3.02 (Chronic Respiratory Disorders) or Listing 3.03 (Asthma). (Tr. 32-33). The ALJ also found that the plaintiff's mental impairments, as well as the plaintiff's obstructive sleep apnea, were non-severe. (Tr. 31-22).

At step three, the ALJ found that, "[a]fter careful consideration of the entire record," the plaintiff had the residual functional capacity ["RFC"] to perform light work, as defined in 20 C.F.R. § 404.1567(b), except she could frequently climb ramps and stairs and occasionally climb ladders, ropes, and scaffolds. (Tr. 33). The ALJ stated that the plaintiff could occasionally stoop, kneel, crouch, and crawl; she could occasionally be exposed to temperature extremes and extreme humidity; and, she could have no concentrated exposure to dust, gases, or fumes. (*Id.*).

The ALJ concluded that the plaintiff was capable of performing her past relevant work as a clerk, secretary, and file clerk. (Tr. 38, citing 20 C.F.R. § 404.1565). Accordingly, the ALJ found

---

Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

that the plaintiff was not under a disability at any time from January 26, 2015, the alleged onset date, through December 6, 2017, the date of the ALJ's decision. (Tr. 39).

IV.    STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). "The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact." *Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citing *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Further, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V. DISCUSSION

The plaintiff contends that the ALJ erred in five respects. First, the plaintiff argues that the ALJ failed to develop the record by not contacting Drs. Lorenzo Galante, Alessandra Buonopane, and/or the treating clinicians at Perspective Center for Care ["PCC"] to obtain medical source statements, and, in the case of PCC, treatment notes and records. (Pl.'s Mem. at 1-9). Second, the plaintiff argues that the ALJ was not properly appointed and thus lacked authority to hear and decide the plaintiff's claim. (*Id.* at 9-12). Third, the plaintiff argues that the ALJ erred at step four, in that the RFC determination was not supported by substantial evidence. (*Id*. at 13-18). Fourth, the plaintiff argues that the ALJ failed to assess properly the plaintiff's complaints of pain. (*Id*. at 18-20). Lastly, the plaintiff argues that the ALJ "[m]isconstrued the [e]vidence." (*Id*. at 20-24).

Whether an ALJ has satisfied his obligation to develop the record "must be addressed as a threshold issue." *Downes v. Colvin*, No. 14-CV-7147 (JLC), 2015 WL 4481088, at *12 (S.D.N.Y. July 22, 2015). "Even if the ALJ's decision might otherwise be supported by substantial evidence, the Court cannot reach this conclusion where the decision was based on an incomplete record." *Moreau v. Berryhill*, No. 17-CV-396 (JCH), 2018 WL 1316197, at *4 (D. Conn. Mar. 14, 2018). Upon a thorough review of the administrative record, the Court concludes that the ALJ failed to adequately develop the record to include treating physician opinions as to the plaintiff's physical and mental functional limitations, as well as the plaintiff's treatment records from PCC. *See Rosa v. Callahan*, 168 F.3d 72, 80 (2d Cir. 1999) (holding that an ALJ's failure to "fulfill his affirmative obligation to develop the administrative record" constitutes legal error).

A. THE ALJ DID NOT SATISFY HIS DUTY TO DEVELOP THE RECORD AS TO THE PLAINTIFF'S MENTAL IMPAIRMENTS

The plaintiff argues that the ALJ failed to develop the record by not contacting Dr. Galante, the plaintiff's primary care provider, or Dr. Buonopane, the plaintiff's psychiatrist, to obtain

medical source statements. (Pl.'s Mem. at 1-2). The plaintiff also argues that the ALJ erred by failing to obtain treatment notes or a medical source statement from PCC. (*Id.*).

"It is the rule in our circuit that the ALJ, unlike the judge in a trial, must himself affirmatively develop the record." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1997) (internal quotation marks omitted); *see Moreau*, 2018 WL 1316197, at *4 ("An ALJ in a social security benefits hearing has an affirmative obligation to develop the record adequately." (internal quotation marks omitted)). The ALJ must develop the record even where the claimant has legal counsel. *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). When the ALJ has failed to develop the record adequately, the court must remand to the Commissioner for further development. *See, e.g., Pratts*, 94 F.3d at 39.

The duty to develop the record is "particularly important where an applicant alleges [she] is suffering from a mental illness, due to the difficulty in determining whether these individuals will be able to adapt to the demands or 'stress' of the workplace." *Craig v. Commissioner of Social Security*, 218 F. Supp. 3d 249, 268 (S.D.N.Y. 2016) (quoting *Merriman v. Commissioner of Social Security*, No. 14-CV-3510, (PGG) (HBP), 2015 WL 5472934, at *19 (S.D.N.Y. Sept. 17, 2015)). In this regard, the SSA regulations state that it is "vital that we review all pertinent information relative to [a plaintiff's] condition" because individuals with mental illness "commonly have [their] li[ves] structured in such a way as to minimize [] stress and reduce [] symptoms and signs. In such a case, [a plaintiff] may be much more impaired for work than [] symptoms and signs would indicate." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00(E).

Here, the ALJ found that the plaintiff's mental impairment of depressive disorder was "nonsevere" because it did not cause more than minimal limitation in the plaintiff's ability to perform basic mental work activities. In evaluating the plaintiff's mental disorder, the ALJ

considered the four broad functional areas set out in section 20 C.F.R. Part 404, Subpart P, Appendix 1, and found that the plaintiff had only mild limitations in the areas of 1) understanding, remembering or applying information; 2) interacting with others; 3) concentrating, persisting, or maintaining pace; and 4) managing oneself. (Tr. 31-32). In reaching this conclusion, the ALJ cited to treatment notes from Dr. Galante, the plaintiff's primary care provider, but did not cite any of the treatment notes from the plaintiff's psychiatrist, Dr. Buonopane. Indeed, the ALJ failed to mention Dr. Buonopane—or reference her treatment records—anywhere in the decision. Nor did the ALJ have a function-by-function assessment from either of these physicians explaining what the plaintiff could and could not do with respect to her mental impairments.

At the outset, the ALJ had an affirmative duty to develop the record fully by obtaining an opinion from Dr. Buonopane and/or Dr. Galante.[6] *See e.g., Peed v. Sullivan*, 778 F. Supp 1247 (E.D.N.Y. 1991) (remanding for failure to obtain an opinion from treating physician). It is well established that "the SSA recognizes the 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)). Consequently, "the expert opinions of a treating physician are of particular importance to a disability determination." *Prince v. Berryhill*, 304 F. Supp. 2d 281, 288 (D. Conn. 2018) (citing *Hallet v. Astrue*, No. 11-CV-1181 (VLB), 2012 WL 4371241, at *6 (D. Conn. Sept. 24, 2012) (concluding that "[b]ecause the expert opinions of a treating physician as to the existence of disability are binding on the factfinder, it is not sufficient for the ALJ simply to secure raw data

---

[6] The Court finds only that the lack of a treating source opinion on the plaintiff's mental impairments was an obvious gap in the record that the ALJ should have remedied. On remand, the ALJ can determine whether it is necessary to obtain treating source opinions as to the plaintiff's mental health impairments from Dr. Galante, Dr. Buonopane and the plaintiff's treating clinicians at PCC, or whether a treating source opinion from just one or two of those physicians is required.

from the treating physician" and remanding for further development of the record). Yet here, the ALJ failed to obtain such an opinion from the plaintiff's treating physicians.[7]

While "the Second Circuit has held that it is not per se error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician," *Moreau*, 2018 WL 1316197, at *7 (internal quotation marks omitted), here, the ALJ made several errors in his decision, and the ALJ's finding of nonseverity was not supported by substantial evidence.

The ALJ first erred by failing to address Dr. Buonopane's treatment notes—which reveal mental limitations—at all in his decision. Dr. Buonopane's treatment notes from June 6, 2016 reflect that the plaintiff presented with an anxious affect and mood, circumstantial and tangential thought process, poor insight, fair judgment, and impaired concentration and memory. (Tr. 596). Dr. Buonopane noted that the plaintiff's concentration and memory were "worse." (*Id.*). Mental status examination results were similar for June 8, 2016, except that the plaintiff's insight was fair. (Tr. 592). On July 1, 2016, the plaintiff presented with an anxious mood, organized thought process, fair insight, good judgment, and good memory and concentration. (Tr. 590). On August 1, 2016, mental status examination results were normal, except that the plaintiff's concentration was impaired. (Tr. 588). On September 9, 2016, the plaintiff presented with an anxious affect and mood, fair insight and judgment, and impaired concentration and memory. (Tr. 586). On September 23, 2016, the plaintiff's concentration and memory were impaired, and her insight and judgment were fair. (Tr. 584). On October 21, 2016, the plaintiff's memory and concentration was impaired, and she presented for treatment with a constricted and anxious affect and anxious mood.

---

[7] The defendant argues that the Commissioner did request an "assessment of functional ability based on your medical findings." (Def.'s Mem. of Law at 15). The record reflects that on December 23, 2015, the Disability Examiner requested "a copy of the [plaintiff's] medical records" from Broadway Medical Group LLC and Community Health Center of Meriden. (Tr. 505, 517). These requests, however, were sent approximately a year and nine months before the ALJ held the plaintiff's hearing and do not satisfy the ALJ's duty to develop the record.

(Tr. 582). On December 2, 2016, the plaintiff's mental status examination results were normal. (Tr. 579). Because these treatment notes reflect impairments, particularly in concentration and memory, the ALJ's failure to discuss them warrants remand.

The ALJ also erred in his evaluation of Dr. Hillband's opinion. The ALJ gave "little weight" to Dr. Hillbrand's opinion because it was "inconsistent with the medical evidence of record." (Tr. 38). Dr. Hillbrand opined that the plaintiff's "ability to comprehend, retain, and carry out simple tasks is mildly impaired," the plaintiff's "ability to comprehend, retain, and carry out complex tasks is moderately impaired," and the plaintiff's "ability to interact appropriately with supervisors, coworkers, and the general public is moderately impaired." (Tr. 500). Dr. Hillbrand found that "concentration" was an area of "relative weakness." (*Id.*). Dr. Hillbrand's opinion was thus consistent with Dr. Buonopane's treatment notes, which also reflected limitations in areas of concentration and memory. (Tr. 579-596). However, because the ALJ did not discuss Dr. Buonopane's treatment notes, he similarly did not consider their consistency with Dr. Hillbrand's opinion. Moreover, the only other medical evidence of the plaintiff's mental impairments cited by the ALJ are Dr. Galante's treatment notes. It is not apparent that Dr. Galante's treatment notes were inconsistent with Dr. Hillbrand's opinion. Indeed, while these treatment notes indicated that the plaintiff remained stable with medication and therapy, they also revealed that the plaintiff had periods of improvement and decline. (Tr. 493, 495, 510-11, 572, 637, 638, 639, 653).

The ALJ's characterization of Dr. Galante's treatment notes is also inaccurate. In his decision, the ALJ repeatedly cites to four exhibits, which contain Dr. Galante's treatment notes, to support his finding of nonseverity. For the first three broad functional areas set out in section 20 C.F.R. Part 404, Subpart P, Appendix 1, the ALJ included the same four sentences: 1) "The claimant was consistently well groomed, fully oriented, coherent, appropriate, alert, pleasant, well

appearing, and in no acute distress (See Ex. 8F, 14F, 19F, 21F)"; 2) "In July of 2015, the claimant denied any suicidal ideation (See Ex. 8F)"; 3) "In February of 2017, the claimant's depression was considered to be controllable through medication (See Ex. 19F)"; and 4) "In August of 2017, her depression was responding well through medication and she was stable (See Ex. 21F)." (Tr. 31-32). The ALJ does not cite any other portions of Dr. Galante's treatment notes.

The ALJ's first sentence mischaracterizes Dr. Galante's treatment notes as a whole. A review of Dr. Galante's treatment notes reveals the following: On January 29, 2015, Dr. Galante noted that the plaintiff "appears depressed, tearful, well-groomed, anxious, [and] fatigued." "[S]he is coherent, appropriate, denies any SI, she is crying [sic] she's upset." (Tr. 493). Dr. Galante noted almost identical findings on July 6, 2015. (Tr. 495). On October 8, 2015, Dr. Galante wrote that the plaintiff "continues to be depressed"; "she appears demotivated and not willing to go out"; and "at times feels sad even though taking medication." Her "general appearance [] appears happy," but she "lack[s] motivation." (Tr. 510-511). On November 8, 2016, Dr. Galante noted that she is "completely stable" on medication. (Tr. 572). On February 8, 2017, Dr. Galante reported that the plaintiff was "pleasant, well-groomed," with an "appropriate mood." (Tr. 637). He noted that she has "off-and-on symptoms of depression" and "needs to [see] her therapist." (Tr. 638). On May 11, 2017, Dr. Galante noted that the plaintiff had a "bad month of depression," where she "was not able to function" and "stayed in bed a lot." (Tr. 639). On August 10, 2017, Dr. Galante noted that the plaintiff's "main problem remains her depression" but that she "remains stable." (Tr. 653). Thus, the ALJ appears to have selectively chosen portions of Dr. Galante's treatment notes, which are not representative of his treatment notes as a whole, to support the statement that the plaintiff was "consistently well groomed, fully oriented, coherent, appropriate, alert, pleasant, well appearing, and in no acute distress." Moreover, even if the ALJ's characterization of Dr. Galante's

treatment notes is correct, it is not clear how these references ("well-groomed," "fully oriented," "pleasant," etc.) are probative of the plaintiff's functional limitations.

Further, even assuming, *arguendo*, that the cited treatment notes suggest that the plaintiff's depression was controlled by medication, it is unclear whether such "control" equates to having the mental ability to perform work. Indeed, Dr. Hillbrand, who personally evaluated the plaintiff, found limitations. Dr. Hillbrand found that the plaintiff was mildly impaired in her "ability to comprehend, retain, and carry out simple tasks," moderately impaired in her "ability to comprehend, retain, and carry out complex tasks," and moderately impaired in her "ability to interact appropriately with supervisors, coworkers, and the general public." (Tr. 500). Dr. Buonopane's treatment notes reflect that the plaintiff had limitations in memory and concentration. (Tr. 579-596). They also reveal that the plaintiff often presented for treatment with an anxious mood and affect. (*Id.*). Dr. Bumpus also submitted a letter from PCC, indicating that the plaintiff "needs continued weekly outpatient therapy." (Tr. 309).[8] Lastly, Dr. Galante's treatment notes indicate that the plaintiff had periods of improvement and decline. The presence of such records makes the necessity of a medical source statement all the more apparent.

However here, instead of relying on Dr. Hillbrand's opinions or seeking a treating physician's opinion on how these limitations would affect the plaintiff's ability to work, the ALJ gave "great weight" to the evaluations of state psychological consultants Christopher Leveille and Robert Starac, who both opined that the plaintiff's mental impairments were non-severe. (Tr. 37). Both consultants based their opinion solely upon review of documents and never personally examined the plaintiff. Further, their evaluations occurred on August 27, 2015 and February 2, 2016, respectively; thus, the full record was not available at the time of their evaluations. The two

---

[8] The ALJ's decision incorrectly asserts that "Dr. Bumpus indicated that it was her opinion that the claimant was disabled (*Id.* at 2)." (Tr. at 38). Dr. Bumpus's letter does not include such a statement. (*See* Tr. 309).

consultants did not have any of Dr. Buonopane's treatment records or PCC's treatment records, nor did they have all of Dr. Galante's treatment notes. Their opinions were thus insufficient to support the ALJ's finding that the plaintiff's mental impairments were nonsevere.

Finally, the plaintiff argues that the ALJ did not develop the record by failing to obtain treatment records from the plaintiff's clinicians at PCC. An ALJ is "required affirmatively to seek out additional evidence only where there are obvious gaps in the administrative record." *Eusepi v. Colvin*, 595 Fed. App'x. 7, 9 (2d Cir. 2014). The absence of treatment records from the plaintiff's therapist qualifies as an "obvious gap" because the plaintiff is alleging that mental health issues limited her ability to work. The ALJ acknowledged as much during the hearing when he stated that these records were "going to be important in this case." (Tr. 71-72).

The defendant argues that the ALJ sufficiently developed the record by granting the plaintiff's counsel two weeks to obtain PCC's treatment records. (Def.'s Mem. at 15). The plaintiff's attorney did not submit the treatment records but did submit a letter from Dr. Bumpus dated October 9, 2017. The defendant argues that it "is not the responsibility of the ALJ" that the plaintiff "is now dissatisfied with that evidence." (*Id.*). The Court disagrees. The ALJ's "obligation is not satisfied when he permits the record to close without counsel having submitted records that the ALJ knows are missing." *Cortes v. Berryhill*, No. 16-CV-1910 (JCH), 2018 WL 1392903, at *4 (D. Conn. Mar. 19, 2018). Contrary to the defendant's argument, this case is not like *Jordan v. Comm'r of Soc Sec.*, 142 F. App'x 542 (2d Cir. 2005). In *Jordan*, the ALJ later contacted the plaintiff's counsel to remind him that no evidence had been received and that "a decision would be made on the existing record unless the evidence was submitted." *Id.* at 543. Here, there is no evidence in the record that the ALJ followed up with the plaintiff's counsel. Thus, the ALJ did not satisfy his duty to develop the record to include the treatment notes from PCC. *See Alamo v.*

*Berryhill*, No. 18-CV-210 (JCH), 2019 WL 4164759, at *5 (D. Conn. Sept. 3, 2019) ("An ALJ does not satisfy his duty to develop the record by providing more time and instructing counsel to ask for assistance in retrieving the evidence if needed"); *Henneghan v. Berryhill*, No. 16-CV-1507, 2018 WL 1316195 (VLB), at *7 (D. Conn. Mar. 14, 2018) (finding that the ALJ failed to take "adequate steps" to obtain medical records where the ALJ asked the plaintiff's representative to submit the records within 30 days, but did not take any other steps to secure the records).

In sum, in this case, given that the ALJ did not have a medical source statement from any of the plaintiff's treating physicians, failed to consider the records from the plaintiff's treating psychiatrist, did not obtain records from the plaintiff's therapist, and erred in his assessment of the only other treating source's records, the Court concludes that the ALJ did not, and could not, reach an "informed decision based on the record" regarding the severity of the plaintiff's mental impairments. *Sanchez v. Colvin*, No. 13-CV-6303 (PAE), 2015 WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015) (holding that the issue as to whether a treating physician's opinion is necessary "focuses on circumstance of the particular case, the comprehensiveness of the administrative record, and, at core, whether an ALJ could reach an informed decision based on the record[.]"); *see also DeLeon v. Colvin*, No. 15-CV-1106 (JCH), 2016 WL 3211419, at *4 (D. Conn. June 9, 2016) (concluding that "assessing whether it was legal error for an ALJ to fail to request a medical source statement from a claimant's treating physician is a case-specific inquiry."). This error, in turn, calls into question the ALJ's RFC assessment, which did not include any limitations based on the plaintiff's mental impairments. Accordingly, a remand is required.

B. THE ALJ DID NOT SATISFY HIS DUTY TO DEVELOP THE RECORD AS TO THE PLAINTIFF'S PHYSICAL IMPAIRMENTS

The plaintiff also argues that the ALJ failed to develop the record because there are no treating physician/clinician opinions on the function-by-function impact of the plaintiff's severe

physical impairments in the record. (Pl.'s Mem. at 1-2). The plaintiff suggests that the ALJ should have sought an assessment from Dr. Galante. (*Id.* at 1).

As discussed above, a hearing on disability benefits is a non-adversarial proceeding and the ALJ therefore has an affirmative obligation to develop the administrative record. *See Perez*, 77 F.3d at 47. However, "remand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33–34 (2d Cir. 2013). "If the medical records themselves shed sufficient light on a claimant's ability or inability to perform work, a medical source statement or formal medical opinion is not necessarily required." *Monroe v. Comm'r of Soc. Sec'y*, 676 F. App'x 5, 8 (2d Cir. 2017); *see also Guillen v. Berryhill*, 697 F. App'x 107, 108-09 (2d Cir. 2017) (remanding because the medical records "offer no insight into how her impairments affect or do not affect her ability to work, or her ability to undertake her activities of everyday life"). Thus, "remand for failure to develop the record is situational and depends on the 'circumstances of the particular case, the comprehensiveness of the administrative records, and . . . whether an ALJ could reach an informed decision based on the record.'" *Holt v. Colvin*, No. 16-CV-01971 (VLB), 2018 WL 1293095, at *7 (D. Conn. Mar. 13, 2018) (quoting *Sanchez*, 2015 WL 736102, at *5-6).

Here, the record reflects that the plaintiff was treated by Dr. Galante as her primary care provider (as well as two other physicians from his office) from 2008 to 2017. The plaintiff also saw Dr. Foster, an orthopedist, on multiple occasions, but only once during the time period at issue. The record includes treatment notes and reports from each of these doctors. However, neither physician provided a medical source statement.

The ALJ found that "while [the plaintiff] did appear to have certain symptoms associated [with] cervical spine and lumbar spine degenerative disc disease[] and asthma[,] the [plaintiff] showed stability in her condition through treatment with her treating physicians." (Tr. 36). Further, the plaintiff's "activities of daily living demonstrate that she has been able to function normally, despite her alleged impairments." (*Id.*). The ALJ found that the plaintiff had the residual functional capacity ("RFC") to perform light work,[9] except that she could frequently climb ramps and stairs and occasionally climb ladders, ropes and scaffolds. (Tr. 33). The claimant could occasionally stoop, kneel, crouch, and crawl. (*Id.*). She could occasionally be exposed to temperature extremes and extreme humidity and could have no concentrated exposure to dust, gases, or fumes. (*Id.*). In so finding, the ALJ gave "great weight" to the findings of the state medical consultants Dr. Barbara Coughlin and Dr. Jose Robelo, who opined that the plaintiff could occasionally lift 20 pounds, frequently climb ramps and stairs, occasionally climb ladders, ropes or scaffolds, and occasionally do most other postural movements. (Tr. 36). Drs. Coughlin and Robelo also noted that the plaintiff needed to avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, gusts, gases, poor ventilation, and other pulmonary irritants. (*Id.*).

At the outset, substantial evidence in the record supports the ALJ's RFC finding regarding the plaintiff's asthma. Nothing in the record supports a conclusion that additional limitations should have been imposed due to the plaintiff's asthma. The records reflect that the plaintiff's asthma was "mild" and controllable through medication. (Tr. 637). Indeed, the plaintiff continued

---

[9] Light work as defined by 20 C.F.R. § 404.1567(b) involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Additionally, light work requires "a good deal of walking or standing," or it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 404.1567(b). "To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." *Id.*

to smoke, despite her asthma, through at least February 8, 2017. (*Id.*). The ALJ thus appropriately accounted for the plaintiff's asthma by limiting her to occasional exposure to temperature and humidity extremes and to no concentrated exposure to dust, gases, or fumes.

However, the ALJ erred in his treatment of the plaintiff's cervical spine and lumbar spine degenerative disc disease, and, more specifically, in his RFC finding that the plaintiff could perform light work, except that she could frequently climb ramps and stairs, occasionally climb ladders, ropes and scaffolds, and occasionally stoop, kneel, crouch, and crawl. (Tr. 33). The first mention in the record of the plaintiff's back, neck and shoulder issues appears on March 4, 2014, when the plaintiff saw Dr. Dipak Patel complaining of tingling in her left hand and right leg, and of limited range of motion in her left shoulder "at times." (Tr. 434). One week later, the plaintiff saw Dr. Galante. (Tr. 345). She reported pain "radiating from her left upper chest to her left arm," as well as "tingling and numbing" in her left arm. (*Id.*). Dr. Galante noted that "reproducible numbing and tingling when she is arching back [] or stepping up with the left leg is causing pains mostly in the buttocks and radiating down to the [c]alfs" and that "[b]ending her neck to the left cause[s] numbing and tingling . . . on the left arm." (*Id.*). The plaintiff had a normal gait and no tremors. (*Id.*).

An MRI of the plaintiff's lumbar spine conducted on March 23, 2014 revealed that "the vertebral body height, alignment and marrow signal [were] within normal limits," the "disc spaces [were] preserved," the "conus medullaris terminates at L1," and there [was] "no signal abnormality within the spinal cord." (Tr. 370). The MRI showed multilevel lumbar spondylosis: "osteoarthrosis without central canal stenosis or neuroforaminal narrowing at T12-L1, L1-L2, and L2-L3," "osteoarthrosis with bilateral left greater than right zygapophyseal joint effusions without central

canal stenosis or neuroforaminal narrowing at L3-L4," and "a disc bulge and osteoarthrosis without central canal stenosis or neuroforaminal narrowing at L4-L5." (*Id.*).

On April 11, 2014, the plaintiff began attending physical therapy. (Tr. 423-426). She attended seven appointments and was discharged on May 7, 2014. (Tr. 372).

On May 8, 2014, Dr. Galante diagnosed the plaintiff with degenerative disc disease and noted that her "lower back pain . . . is due to arthritic changes." (Tr. 341). A physical examination revealed that the plaintiff's lumbar muscles were "supple by palpation," and a straight leg test was negative. (*Id.*). The plaintiff saw Dr. Dianne DeFusco on June 28, 2014, complaining of back pain. (Tr. 339). A physical examination revealed "nontender vertebrae" and "paraspinal muscle tenderness lower lumbar mild." (Tr. 340). Dr. DeFusco noted that "most" of the plaintiff's pain was "muscular rather than disc," and there was "no imaging evidence [of] spinal stenosis." (*Id.*). The plaintiff next saw Dr. Craig R. Foster, an orthopedist, on July 16, 2014, for evaluation of her back and neck. (Tr. 385). Dr. Foster found "decreased range of motion of [the plaintiff's] cervical and . . . lumbar spine lacking about 20 degrees in all directions." (*Id.*). An x-ray confirmed degenerative changes, as well as "straightening" and "osteophyte formation." (*Id.*). He noted that the plaintiff, "while neurologically intact," had "a lot of facet disease." (*Id.*).

An MRI of the plaintiff's cervical spine was completed on August 5, 2014. (Tr. 394-95). This MRI revealed "mild multilevel cervical spondylosis" and "no localizing disc herniation." (Tr. 395). When the plaintiff returned to Dr. Foster on August 11, 2014, he diagnosed the plaintiff with cervical spondylosis, lumbosacral spondylosis, low back pain, facet syndrome, grade 3 impingement of the left shoulder, and suspicious rotator cuff tear. (Tr. 383). Dr. Foster noted "decreased range of motion of [the plaintiff's] cervical spine about 5-10 degrees in all directions including the neck in the lumbar spine." (Tr. 384). "Her left shoulder [was] tender and with a

positive impingement sign." (*Id.*) "She ha[d] full range of motion [in her] left shoulder but with abduction and rotation." (*Id.*). Also, the plaintiff had "signs and symptoms and x-rays positive for impingement with fairly significant anterior acromial spur area." (*Id.*).

A physical examination in October 2014 revealed "no midline tenderness to palpation of the thoracic or lumbar spine." (Tr. 380). The plaintiff was able to demonstrate forward flexion, reaching her toes without difficulty. (*Id.*). She demonstrated 30 degrees of extension without difficulty, and she was able to flex laterally to the right and left without difficulty. (*Id.*).

At a January 2015 appointment, the plaintiff reported increased back pain with leg pain and numbness following a slip and fall on the ice in December 2014. (Tr. 378). An examination revealed tenderness on palpation of her lumbar spine, increased pain and stiffness with extension and flexion, increased pain with lateral rotation, a positive straight leg test bilaterally, no decreased strength in the lower extremities, and decreased sensation to light touch in the right lower extremity. (*Id.*). An MRI of the plaintiff's lumbar spine was conducted on January 25, 2015, which revealed "mild multilevel degenerative disc disease with broad based disc bulges causing mild central canal stenosis and bilateral neural foraminal encroachment." (Tr. 396). There had been no "appreciabl[e] change[s] compared to [the plaintiff's last MRI]." (*Id.*).

The first medical record post-onset date is from Dr. Galante on January 29, 2015. (Tr. 450). The plaintiff did not complain of back pain at this appointment. (*Id.*). On February 19, 2015, the plaintiff returned to Dr. Foster. (Tr. 376). At that appointment, Dr. Foster noted that the plaintiff was "still complaining" of back pain. (*Id.*). A physical examination showed "negative straight leg raising to the lower extremities," and "no back pain with straight leg raising." (*Id.*). The plaintiff's reflexes, motor, and sensory exams were within normal limits. (Tr. 376-77). She had "some spasm in her lower back with a slight loss of range of motion in the L1-L5 segment." (Tr. 377). Dr. Foster

diagnosed "low back arthritis with mild central and foraminal stenosis" and "intermittent sciatica." (*Id.*). Physical therapy and anti-inflammatories were recommended. (*Id.*).

The plaintiff saw Dr. Galante on July 6, 2015, complaining of ongoing lower back pain with numbness in both legs. (Tr. 495). Straight leg tests were negative bilaterally. (Tr. 510). Lumbar muscles were mildly tender on palpation. (*Id.*). On October 8, 2015, Dr. Galante reported that the plaintiff's "current back pain [was] mild and not affecting her functionality." (Tr. 511). She did not have impairments in walking, shopping, "in the stairs [sic]," or driving. (Tr. 510). The plaintiff did not complain of back pain again until November 8, 2016. (Tr. 572). At that time, the plaintiff reported to Dr. Galante that "pain is present all the time" and it is "worse if she does too much activity during the day." (*Id.*). Dr. Galante's treatment notes do not reference the plaintiff's back pain again until May 11, 2017, when he noted that she "feels the pain is stronger . . . when she stays in the same position [for a] longer period [of] time." (Tr. 640). On August 10, 2017, Dr. Galante noted that "the low back pain seems to be mostly muscular and mild." (Tr. 654).

Here, a remand is warranted because the ALJ did not have a function-by-function assessment by any of the plaintiff's treating physicians explaining what the plaintiff could and could not do with respect to her cervical spine or lumbar spine impairments. Nor did the record contain any formal opinions from a consultative examiner about the plaintiff's physical limitations with respect to her ability to work. Instead, the only medical opinions in the record were from the state medical consultants Dr. Coughlin and Dr. Rabelo, who did not personally examine the plaintiff and who did not base their opinions on the full medical record. Indeed, Dr. Coughlin conducted her review on September 9, 2015, and Dr. Rabelo conducted his review on February 5, 2016, while the plaintiff's relevant medical records continue until August 2017. *See Prince*, 304 F. Supp. 2d at 288-89 (D. Conn. 2018) (holding that the ALJ could not ascertain the claimant's

limitations without views from the treating physician as to the claimant's RFC in light of her impairments); *Paredes v Comm'r of Soc. Sec.,* No. 16-CV-00810 (BCM), 2017 WL 2210865, at *18 (S.D.N.Y. May 19, 2017) (remanding where the only medical opinion on the claimant's physical limitations came from a non-examining medical expert "who based his opinion . . . entirely on his review of non-opinion medical records from the claimant's treating physicians and the claimant's testimony at the second of his two hearings").

Further, this case is not one in which the medical records shed enough light on the plaintiff's ability or inability to perform work, such that a treating physician's opinion is unnecessary. Neither the medical records nor the treating physicians' notes sufficiently document "how [the plaintiff's] impairments affect or do not affect her ability to work, or her ability to undertake her activities of everyday life." *Guillen*, 697 F. App'x at 109. For instance, nothing in the medical records addresses whether the plaintiff has limitations in sitting or standing for certain periods of time. The defendant argue that Dr. Galante's October 2015 and August 2017 statements found in his treatment notes—that the plaintiff's back pain is not affecting her "functionality" and that the plaintiff has "no limitations and postural walking [sic]"—provide support for the ALJ's RFC assessment. However, the ALJ does not mention the first statement (or Dr. Galante's October 2015 treatment notes) anywhere in his decision, and, for both statements, it is not clear whether Dr. Galante is referring to the plaintiff's ability to work. Thus, these statements are not sufficient to support the ALJ's RFC, especially where the remainder of the treatment notes address only the plaintiff's diagnoses and symptoms, not any functional limitations.

Accordingly, because the ALJ did not have a functional assessment from any treating physician or examining consulting physician, the state agency consultants did not assess the entire record, and the treatment notes do not sufficiently show the plaintiff's functional limitations (or

lack thereof), a remand is warranted for further development of the record and reconsideration of the plaintiff's RFC. *See Holt*, 2018 WL 1293095, at \*7; *Guarino v. Colvin*, No. 14-CV-598 (MAT), 2016 WL 690818, at \*2 (W.D.N.Y. Feb. 22, 2016) (an ALJ cannot determine the plaintiff's RFC solely "on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence.").

VI.     ALJ'S AUTHORITY TO PRESIDE OVER THIS CASE

The plaintiff seeks a remand of this case under *Lucia v. Securities and Exchange Commission*, 138 S. Ct. 2044 (2018), on the ground that the ALJ was an inferior officer who was not properly appointed under the United States Constitution's Appointments Clause at the time of the hearing, and thus, did not have the legal authority to preside over this matter or to issue a decision.  (Pl.'s Mem. at 9-12).

In *Lucia*, which was decided on June 21, 2018, the United States Supreme Court ["Supreme Court"] held that a "timely challenge" may be made to the "constitutional validity" of the appointment of an officer during the administrative process.  *See Lucia*, 138 S. Ct. at 2055.  The Court explained that the remedy for a *timely* challenge to the constitutional validity of the appointment of an ALJ who adjudicates a case is a "new 'hearing before a properly appointed' official."  *Id.* (quoting *Ryder v. United States*, 515 U.S. 177, 182-83 (1995)).  The rehearing must be heard by a new, "properly appointed" ALJ.  *Id.*

On July 10, 2018, the President of the United States issued an Executive Order stating that: "perhaps all—ALJs are 'Officers of the United States' and thus subject to the Constitution's Appointments Clause, which governs who may appoint such officials." Exec. Order No. 13843, 83 Fed. Reg. 32755 (July 10, 2018).  On July 16, 2018, the Acting Commissioner of Social Security

ratified the appointments of all SSA ALJs and approved those appointments as her own, thereby remedying the issue identified in *Lucia*. *See* Social Security Emergency Message (EM) 18003 REV 2, § B (available at: https://secure.ssa.gov/apps10/reference.nsf/links/08062018021025PM); Social Security Ruling 19-1p, 2019 WL 1324866 (S.S.A. Mar. 15, 2019).

As Judge Robert F. Kelly from the Eastern District of Pennsylvania noted, the agency most impacted by *Lucia* is the SSA. *See Marchant on behalf of A.A.H. v. Berryhill*, No. CV 18-0345, 2019 WL 2268982, at *2 (E.D. Pa. May 28, 2019) (multiple citations omitted). In the wake of *Lucia*, "courts have struggled to interpret what constitutes a 'timely challenge' during SSA proceedings." *Id.* at *2. The vast majority of courts have interpreted an Appointments Clause challenge to an ALJ in an SSA case to be "timely" if the challenge is raised during the administrative process. *See Bonilla-Bukhari v. Berryhill*, 357 F. Supp. 3d 341, 351 (S.D.N.Y. Mar. 4, 2019) (collecting cases). Conversely, there are a limited number of courts, led by the decision in *Bizarre v. Berryhill*, 364 F. Supp. 3d 418 (M.D. Pa. 2019), that have rejected the restrictive interpretation of *Lucia*, holding that an Appointments Clause challenge cannot be waived by failing to raise it at the administrative level. *See Marchant*, 2019 WL 2268982, at *3 (collecting cases).

Directed by the Supreme Court's clear language in *Lucia*, this Court concludes that an Appointments Clause challenge may not be raised for the first time on appeal to the district court. Such a challenge must be raised at some point in the administrative proceedings. *See Lucia*, 138 S. Ct. at 2055 (stating "'one who makes a timely challenge to the constitutional validity of an officer who adjudicates his case' is entitled to relief."). This holding is in line with the decisions published in our Circuit thus far. *See, e.g., Debiase v. Saul*, No. 19-CV-68 (RMS), 2019 WL 5485269, at *4 (D. Conn. Oct. 25, 2019); *Nestor v. Comm'r of Soc. Sec.*, 19 CV 580 (BNC), 2019

WL 4888649, at *2-3 (E.D.N.Y. Oct. 3, 2019); *McMorris v. Comm'r of Soc. Sec.*, No. 6:18 CV 6118 (DB), 2019 WL 2897123, at *9-11 (W.D.N.Y. Jun. 26, 2019); *Johnson v. Berryhill*, No. 3:17 CV 1651 (VAB), 2019 WL 1430242, at *13-14 (D. Conn. Mar. 29, 2019); *Bonilla-Bukhari,* 357 F. Supp. 3d at 350 (noting that district courts within the Second Circuit have held that the failure to raise an issue with the ALJ waives judicial review, and acknowledging agreement with "the vast majority of courts that have considered this issue following *Lucia* and have concluded that exhaustion before the ALJ is required."); *Lobbe v. Berryhill*, 17 Civ. 5589 (HBP), 2019 WL 1274941, at *19-20 (S.D.N.Y. Mar. 20, 2019). Accordingly, the Court rejects the plaintiff's claim that this case must be remanded on this ground.

## VII. REMAINING ARGUMENTS

The plaintiff also argues that (1) the ALJ's Step Four findings are insufficient; and (2) the ALJ erred in his treatment of the plaintiff's claims of pain. Upon remand, after considering the plaintiff's functional limitations as described by the providers who treated the plaintiff during the relevant period at issue, the ALJ shall consider the plaintiff's complaints of pain, and, if necessary, shall reach a finding at step four supported by all of the medical evidence in the record. Accordingly, in light of the Court's conclusion in Sections V.A. and V.B. *supra*, the Court need not address these arguments further.

## VIII. CONCLUSION

For the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 13) is GRANTED such that this case is remanded for further development of the record to include statements of the plaintiff's functional limitations from treating providers regarding the relevant period at issue, reweighing of the evidence in light of this

new information, a *de novo* hearing before an ALJ, and a new decision. The defendant's Motion to Affirm (Doc. No. 17) is DENIED.

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c). The Clerk's Office is instructed that, if any party appeals to this Court the decision made after this remand, any subsequent social security appeal is to be assigned to the Magistrate Judge who issued the Ruling that remanded the case.

Dated this 8th day of November, 2019 at New Haven, Connecticut.

  /s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge